**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾X        **ECF CASE**

**CARMEN AMBERT**

                                        **AMENDED COMPLAINT**
                    **Plaintiff,**

                                        **08- CV- 3073 (RJH)**

            **-against-**

                                        **Jury Trial Demanded**


**NEW YORK CITY HOUSING AUTHORITY;**
**TINO HERNANDEZ, In His Individual Capacity**
**And As Chairman Of The New York City Housing**
**Authority; And DOUGLAS APPLE, In His Individual**
**Capacity And As General Manager Of The New York**
**City Housing Authority.**

                    **Defendants.**
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾X


Plaintiff, **CARMEN AMBERT**, by her attorney, **LEE NUWESRA**, with law offices at 1623 Unionport Road, Suite 101, Bronx, N.Y. 10462, complaining of Defendants, **THE NEW YORK CITY HOUSING AUTHORITY, its Chairman TINO HERNANDEZ, in his Official and Individual capacity, and its General Manager, DOUGLAS APPLE, in his Official and Individual capacity,** respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This is an action against Defendants, the New York City Housing Authority, Tino Hernandez, as Chair of Defendant Housing Authority and his Individual capacity, and Douglas Apple, as General Manager of Defendant Housing Authority and Individually, in that they violated Plaintiff's rights under the First Amendment, and Equal Protection

Clauses of the Fourteenth Amendment, as protected under the United States Constitution and 42 U.S.C. § 1983. Moreover, Plaintiff brings supplemental State and City discrimination claims against all Defendants based on Sex and/or Age Hostile Work Environment, as well as Retaliation in the terms, conditions and privileges of employment as protected under the New York State Human Rights Law, Executive Law §§ 290 et seq. (the "Human Rights Law"), and by the New York City Human Rights Law, Administrative Code § 8-101 et seq. (the "Code").

**2.**     Plaintiff also seeks costs and attorneys fees authorized by 42 U.S.C. § 1988 and the Code § 502(f), as well as other relevant statutes.

## JURISDICTION AND VENUE

**3.**     The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), 2201, and 2202, the First and Fourteenth Amendments to the United States Constitution and the aforementioned Statutory provisions.

**4.**     Supplemental jurisdiction of the Court over State and Local Claims brought under the Human Rights Law, and the Code are based on 28 U.S.C. § 1367(a).

**5.**     The unlawful practices alleged below were committed in New York County and within the State of New York. Accordingly, venue lies within the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

**6.**     Plaintiff Carmen Ambert hereinafter ("Plaintiff" or "Ambert") resides in Queens County, State of New York.

**7.**     Upon information and belief, Defendant the New York City Housing Authority hereinafter ("Defendant" or "Authority") is a Non-Mayoral City Agency, and a Municipal Corporation created under the laws of the State of New York, with its Central Offices located at 250 Broadway, in New York County, and the State of New York.  As such it was/is acting under Color of State Law.

**8.**     Upon information and belief, during all relevant times, Defendant Tino Hernandez, (hereinafter "Defendant" or "Hernandez"), was the Chairperson of Defendant Authority, and as such was acting under Color of State Law.

**9.**     Defendant Douglas Apple, (hereinafter "Defendant" or "Apple"), at the time of the events giving rise to the complaint was and still the General Manager of Defendant Authority, and as such was acting under Color of State Law.

## THE FACTS

**10.**     Plaintiff is a female employee of Defendant Authority, born in the year 1946, who engaged in protected activity.

**11.**     In March 1998, Plaintiff was assigned by the New York City Mayor's Office (hereinafter "City Hall"), to serve as Assistant to Defendant New York City Housing Authority's Chairperson.  At the time, Mr. Ruben Franco was the Chairman of Defendant New York City Housing Authority.

**12.**     While at City Hall, Plaintiff served as Deputy Chief Of Staff, Of The Department Of Education and Human Services.

**13.**     After her initial assignment to Defendant Authority, Plaintiff was directly supervised by Chairman Franco, until his departure in 1999.  Amongst her various duties,

Plaintiff served as the Chair's Liaison and the Mayor's Surrogate within the Latino Community.

**14.**     Moreover, before his departure, Chairman Franco assigned Plaintiff the Project of evaluating all of Defendant New York City Housing Authority's Senior Citizen Centers. This was a necessary step, in anticipation of the merger of the New York City Housing Authority's Senior Citizen Center and the New York City Department For The Aging (hereinafter "DFTA").

**15.**     In 1999, Mr. John Martinez, replaced Mr. Franco as New York City Housing Authority's Chairperson.  Soon after his appointment, Mr. Martinez assigned Plaintiff the responsibility of designing the Self-Empowerment Initiative Project, (hereinafter "Initiative Project").

**16.**     This empowerment project was the brain child of Plaintiff.  The Initiative Project's goal was to explore more meaningful ways of communication between Defendant Authority and its Residents.  Moreover, it devised better ways to get New York City Housing Authority's Residents more involved with Defendant Authority's selection process for its occupants.

**17.**     Plaintiff's efforts in developing and instituting the Initiative Project won Defendant Authority much acclaim from various Resident Organizations, Political and Community Leaders.  It also became a model for other Regional and National Housing Authorities, and culminated in getting HUD's "Best Practice Award".

**18.**    Plaintiff's work ethics, talent, and dedication to Defendant Authority, caused Chairman Martinez to elevate her and make her a member of New York City Housing Authority's upper management "echelon".  Throughout his tenure, from 1999-2002, Mr. Martinez continued to directly supervise Plaintiff, and assign her meaningful projects. He also moved Plaintiff's physical office from the 9th floor to the Executive Offices, on the 12th floor of Defendant Authority's Headquarters.

**19.**    In March 2002, Defendant Tino Hernandez became the Chairman of Defendant Authority, replacing Mr. Martinez. Initially, Plaintiff continued to report directly to Defendant Hernandez.

**20.**    At Some Point, Plaintiff was demoted and was directed to report to the Authority's General Manager, namely Defendant Douglas Apple. Before this demotion, both Plaintiff and Defendant Apple reported to Defendant Hernandez directly. Plaintiff believes that this demotion was due to Defendant Hernandez's preference to be surrounded by younger female employees.

**21.**    In late 2005 and early 2006, Defendant Hernandez began to assign Plaintiff tasks that were personal in nature, without any benefit or relation to the Business of Defendant Authority.  Although she complained, her grievances were ignored by Defendant Authority's High Level Managers.

**21(a)   In 2005, Defendant Chair requested that Plaintiff personally intercede with her former boss, namely Ms. Ninfa Segarra. Ms. Segarra was a Deputy Mayor in the Giuliani Administration. During said relevant time period, Defendant Hernandez served as Ms. Segarra's Chief of Staff. Initially, Defendant Hernandez had arranged for both Ms. Segarra and Plaintiff to have meetings after working hours.**

**21(b)   Unbeknown to Plaintiff, at the time, Ms. Segarra and Defendant Hernandez were involved romantically. During many of these meetings that were arranged by Hernandez, Ms. Segarra revealed to Plaintiff that this romantic relationship had been ongoing for seven (7) years. Although Plaintiff requested to be relieved from her new assignment by Defendant Chair, she was unsuccessful.**

**21(c)   Instead of relieving Plaintiff from this personal entanglement, Ms. Ambert was made to have lunches and other meetings with Ms. Segarra during business hours. Shortly thereafter, Plaintiff discovered that she was assigned this task, because Defendant Chair was having a triangle love affair with Ms.Segarra and his then Chief of Staff, Ms. Natalie Rivers.**

**21(d)   Plaintiff protested the situation Defendant Hernandez placed her in. She estimated that her new task of keeping an eye on Ms. Segarra and reporting back to Defendant Chair accounted for 50% of her working hours, as well as numerous additional hours spent with Ms. Segarra after work and on weekends. Plaintiff was also made to spend upward of $1, 300 on meals and other out of pocket expenses.**

**21(e)   Plaintiff complained to Defendant Hernandez that he was placing her in a compromised position, and that she did not feel right about what he was requiring her to do.**

**21(f)   His response was that Plaintiff should find Ms. Segarra a Boyfriend. He would also refer to Ms. Segarra as a "Bitch", and Defendant Hernandez was always concerned that if Plaintiff did not help keep Ms.Segarra at bay, that his potential of being named Deputy Mayor would be compromised.**

22.    After Defendant Hernandez was appointed as the new Chair of Defendant Authority, Plaintiff witnessed and became aware of inappropriate conduct by High Level Male Executives which she viewed as contributory to a Hostile Work Environment against Women in general, and Older Women in particular. These Executives included Defendants Hernandez and Apple.

23.    Examples of the inappropriate conduct Plaintiff witnessed and/or became aware of included but was not limited to, sexist and ageist remarks, as well as inappropriate touching.  Although she complained about same, instead of remedying the situation, she was retaliated against.  These complaints were related to Defendant Authority's General Counsel as well, all to no avail.

**23(a)   In late 2006, a series of incidents occurred where Defendant Chair fondled various young female employees of Defendant NYCHA. One such occasion took place during the mayoral inaugural celebration; where Plaintiff witnessed Defendant Hernandez fondle a young female executive secretary, namely A.M.**

**23(b)   Plaintiff related this publicly demonstrated inappropriate fondling of A.M. to NYCHA's General Counsel, Mr. Ricardo E. Morales. Within a few weeks, A.M. was transferred out.**

**23( c)  During a trip to Puerto Rico, Plaintiff met again with General Counsel Morales, and discussed Defendant Hernandez's drinking, fondling and other inappropriate behavior. When Defendant Hernandez's inappropriate behavior continued, unabated, Plaintiff e-mailed Mr. Morales requesting to meet with him again. At a meeting in Plaintiff's office, Mr. Morales commented in Spanish "Entonces el hombre tiene la mano suelta," an English translation would be "So, the man has loose hands."**

24.     After her demotion and in retaliation for engaging in protected activity, Plaintiff was excluded from Top Cabinet Members' Meetings she used to attend.  Moreover, she was stripped of her office space in the Executive Offices Area, and relegated to a small desk space, outside Defendant Apple's Office.

**24(a)   In 2005 and 2006, Plaintiff became aware that Defendant General Manager was having a romantic affair with a married subordinate female employee. This inappropriate conduct caused the woman's husband to create a very ugly scene at NYCHA's Offices. As a result of this sexual relationship between Defendant Apple and his subordinate, said female employee was given preferential treatment, including but not limited to unearned promotion(s) and salary raise(s).**

**24(b)   There were other instances of sexual harassment meted out by other male Deputy General Managers, whom reported to Defendant Apple. These instances of sexual misconduct were also brought to the attention of Defendant NYCHA's top managers, all to no avail.**

**24( c)   Similarly, other issues of public concerns were brought to the attention of top managers of Defendant NYCHA. These concerns were also ignored and covered up by Defendant Apple. These issues included unethical and fraudulent practices.**

**24(d)   For example, one such incident involved Defendant NYCHA's 2005-2006 telephone voice system. A high level executive of NYCHA shared this information with Ms. Ambert and sought to meet with her and Defendant Apple to discuss the same. Within 24 hours of Plaintiff bringing this to Defendant Apple's attention, said executive was transferred out of Defendant NYCHA to another City Agency.**

**24(e)   Another issue arose from IBM's belated irregular bidding into a contract that was worth millions of dollars. In that instant, a low level manager was ordered to reopen the Request for Proposal, after the bidding process was deemed closed. After the bidding was reopened, in contravention of proper rules and procedures, IBM was awarded said contract, to the exclusion of others who had followed the proper Legal Process.**

**25.**    In addition, and overtime, Defendants failed to assign Plaintiff any meaningful assignments.  Plaintiff's ensuing demotion, caused and continues to cause Plaintiff great embarrassment and humiliation amongst her Peers, and various Community and Political Leaders that frequented Defendant Authority, especially its Executive Offices.

**26.**    Due to her complaints of a sexist and hostile work environment, amongst others; Plaintiff was further isolated, stripped of her usual responsibilities, and not given the opportunity to advance within Defendant New York City Housing Authority.

**27.**    For instance, during the last Mayoral Election Campaign, in the Summer/Fall 2005, Plaintiff used her personal vacation time to assist the incumbent's Campaign in the Bronx County.  Due to her outstanding work in said Mayoral Campaign, Defendant Hernandez promised Plaintiff a substantial salary increase, as well as promotional advancement. To date, neither has materialized. Although Plaintiff applied for a vacant higher position within Defendant Authority, Defendant Hernandez blocked her from attaining said position. This position would have increased Plaintiff's annual salary by 15%, with commensurate increase in benefits.

**28.**    Plaintiff was also retaliated against by Defendants Apple and Hernandez, for exercising her First Amendment Right to speak out on Issues of Public Concern.

**29.**    Amongst others, on March 24, 2006, Defendant Apple summoned Plaintiff to his Office, berated and scolded her; because she had expressed her Opinion to a Spanish Newspaper, namely El Diario. The newspaper quoted Plaintiff as representing her

Hispanic Community's Concern, that the Administration, up to that point, did not appoint enough Latinos, into high responsible positions within the City government.  Plaintiff brought this demeaning experience to Defendant Hernandez's attention.

30.    Within a month of the Newspaper's Article, Plaintiff was removed from the 12th floor to the 11th floor.  All alone, she continues to be isolated in the desolated space on the 11th floor, which served as Office Furniture Storage Area.  Moreover, in an attempt to constructively discharge Plaintiff, Defendant Apple continues to ignore her or assign her any meaningful work that is commensurate with her experience and education.

31.    Although Plaintiff continued to protest Defendants' discriminatory and retaliatory conduct to the Authority's General Counsel, Mr. Ricardo Elias Morales; she continues to be subjected to a Hostile Work Environment.

32.    Furthermore, Defendant Apple continues to threaten Plaintiff with termination, for engaging in protected activities.

## **DAMAGES**

33.    As a direct and proximate consequence of Defendants' intentional Constitutional violations and unlawful discriminatory employment policies and/or practices, as

heretofore and hereafter described, Plaintiff has suffered loss of income, including past and future salary increases, promotional opportunities, severe mental and emotional harm, and other non-pecuniary losses, including, but not limited to, emotional pain, anxiety, depression, loss of self-esteem, and injury to her professional standing, and had to incur expenses.

**AS AND FOR A FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 (Violation Of 1st and 14th Amendments By Defendants, Authority, Defendant Hernandez, In His Official And Individual Capacity, And Defendant Apple, In His Official And Individual Capacity, Jointly And Severally).**

**34.**    Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 33 of this Amended Complaint with the same force and effect as if each were fully set forth herein.

**35.**    At all times relevant to this Complaint. Defendant New York City Housing Authority was/is a Non-Mayoral agency of The City Of New York, and was/is acting under Color of State Law.

**36.**    At all relevant times to this Complaint, Defendant Authority was/is a political subdivision of the City and State of New York, acting under Color of State Law and responsible for the conduct of its personnel, including its Chair and General Manager.

**37.**    At all relevant times, Defendant Hernandez was Defendant Authority's Chairperson, and as such was/is acting under Color of State Law.

**38.**    At all relevant times, Defendant Apple was Defendant Authority's General Manager, also acting under Color of State Law.

**39.**    On March 24, 2006, Defendant Apple summoned Plaintiff to his Office, berated and scolded her; because she had expressed her Opinion to a Spanish Newspaper, namely El Diario. The newspaper quoted Plaintiff as representing her Hispanic Community's Concern, that the Administration, up to that point, did not appoint enough Latinos, into high responsible positions within the City Government.  Plaintiff brought this demeaning experience to Defendant Hernandez's attention.

**40.**    Within a month of the Newspaper's Article, Plaintiff was removed from the 12th floor to the 11th floor.  All alone, she continues to be isolated in the desolated space on the 11th floor, which serves as a Office Furniture Storage Area.  Moreover, in an attempt to constructively discharge Plaintiff, Defendant Apple continues to ignore her or assign her any meaningful work that is commensurate wither her experience and education.

**41.**    In their capacities as the Chair and General Manager, respectively, Defendants Hernandez and Apple violated Plaintiff's First Amendment Right by retaliating against her for expressing an issue of public concern as it related to the Government of New York City, with its relation to the Latino Community, when she was berated, demeaned, humiliated and further isolated, without any chance of professional advancement.

**42.**    Plaintiff is a member of a protected class of persons, under the Equal Protection Clause of the 14th Amendment to the United States Constitution, being a Female.

**43.**    In March 2002, Defendant Tino Hernandez became the Chairman of Defendant Authority, replacing Mr. Martinez. Initially, Plaintiff continued to report directly to Defendant Hernandez.

**44.**    At Some Point, Plaintiff was demoted and was directed to report to the Authority's General Manager, namely Defendant Douglas Apple. Before this demotion,

both Plaintiff and Defendant Apple reported to Defendant Hernandez directly. Plaintiff believes that this demotion was due to Defendant Hernandez's preference to be surrounded by younger female employees.

45.    In late 2005 and early 2006, Defendant Hernandez began to assign Plaintiff tasks that were personal in nature, without any benefit or relation to the Business of Defendant Authority. Although she complained, her grievances were ignored by Defendant Authority's High Level Managers.

46.    After Defendant Hernandez was appointed as the new Chair of Defendant Authority, Plaintiff witnessed and became aware of inappropriate conduct by High Level Male Executives which she viewed as contributory to a Hostile Work Environment against Women in general, and Older Women in particular. These Executives included Defendants Hernandez and Apple.

47.    Examples of the inappropriate conduct Plaintiff witnessed and/or became aware of included but are not limited to, sexist and ageist remarks, as well as inappropriate touching. Although she complained about same, instead of remedying the situation, she was retaliated against. These complaints were related to Defendant Authority's General Counsel as well, all to no avail.

48.    In retaliation, Plaintiff was also excluded from Top Cabinet Members' Meetings she used to attend. Moreover, she was stripped of her office space in the Executive Offices Area, and relegated to a small desk space, outside Defendant Apple's Office.

49.    Due to her complaints of a sexist and hostile work environment, amongst others; Plaintiff was further isolated, stripped of her usual responsibilities, and not given the opportunity to advance within Defendant New York City Housing Authority.

**50.**    But for Plaintiff's Sex, and engagement in protected activity, amongst others, she would not have been demoted by Defendants without the opportunity for promotion.

**AS AND FOR A SECOND CAUSE OF ACTION: (Hostile Work Environment In Violation Of The New York State Human Rights Law Based On Sex, Age, And Retaliation By All Defendants Jointly And Severally).**

**51.**    Plaintiff repeats and re-avers each and every allegation contained in paragraphs 1 through 50 of this Amended Complaint with the same force and effect.

**52.**    Plaintiff is a 62 year old Female, who engaged in Protected Activity, and as such, she is a member of a class of persons covered by and protected by the New York State Human Right Law, Executive Law § 290 et. seq.,

**53.**    During her tenure with Defendants, Plaintiff's work performance, was and continues to be exemplary.

**54.**    In March 1998, Plaintiff was assigned by the New York City Mayor's Office (hereinafter "City Hall"), to serve as Assistant to Defendant New York City Housing Authority's Chairperson.  At the time, Mr. Ruben Franco was the Chairman of Defendant New York City Housing Authority.

**55.**    While at City Hall, Plaintiff served as Deputy Chief Of Staff, Of The Department Of Education and Human Services.

**56.**    After her initial assignment to Defendant Authority, Plaintiff was directly supervised by Chairman Franco, until his departure in 1999.  Amongst her various duties, Plaintiff served as the Chair's Liaison and the Mayor's Surrogate within the Latino Community.

**57.**    Moreover, before his departure, Chairman Franco assigned Plaintiff the Project of evaluating all of Defendant New York City Housing Authority's Senior Citizen Centers. This was a necessary step, in anticipation of the merger of the New York City Housing Authority's Senior Citizen Center and the New York City Department For The Aging (hereinafter "DFTA").

**58.**    In 1999, Mr. John Martinez, replaced Mr. Franco as Chair of the New York City Housing.  Soon after his appointment, Mr. Martinez assigned Plaintiff the responsibility of designing the Self-Empowerment Initiative Project, (hereinafter "Initiative Project").

**59.**    This empowerment project was the brain child of Plaintiff.  The Initiative Project's goal was to explore more meaningful ways of communication between Defendant Authority and its Residents.  Moreover, it devised better ways to get New York City Housing Authority's Residents more involved with Defendant Authority's selection process for its occupants.

**60.**    Plaintiff's efforts in developing and instituting the Initiative Project won Defendant Authority much acclaim from various Resident Organizations, Political and Community Leaders.  It also became a model for other Regional and National Housing Authorities, and culminated in getting HUD's "Best Practice Award".

**61.**    Plaintiff's work ethics, talent, and dedication to Defendant Authority, caused Chairman Martinez to elevate her and make her a member of New York City Housing Authority's upper management "echelon".  Throughout his tenure, from 1999-2002, Mr. Martinez continued to directly supervise Plaintiff, and assign her meaningful projects. He also moved Plaintiff's physical office from the 9th floor to the Executive Offices, on the 12th floor of Defendant Authority's Headquarters.

**62.**     In March 2002, Defendant Tino Hernandez became the Chairman of Defendant Authority, replacing Mr. Martinez. Initially, Plaintiff continued to report directly to Defendant Hernandez.

**63.**     At one point, Plaintiff was demoted and was directed to report to the Authority's General Manager, namely Defendant Douglas Apple. Before this demotion, both Plaintiff and Defendant Apple reported to Defendant Hernandez directly.   Plaintiff believes that this demotion was due to Defendant Hernandez's preference to be surrounded by younger female employees, who tolerated his sexual advances and inappropriate touching.

**64.**     In late 2005 and early 2006, Defendant Hernandez began to assign Plaintiff tasks that were personal in nature, without any benefit or relation to the Business of Defendant Authority. Although she complained, her grievances were ignored by Defendant Authority's High Level Managers.

**65.**     After Defendant Hernandez was appointed as the new Chair of Defendant Authority, Plaintiff witnessed and became aware of inappropriate conduct by High Level Male Executives which she viewed as contributory to a Hostile Work Environment against Women in general, and Older Women in particular. These Executives included Defendants Hernandez and Apple.

**66.**     Examples of the inappropriate conduct Plaintiff witnessed and/or became aware of included but are not limited to, sexist and ageist remarks, as well as inappropriate touching.   Although she complained about same, instead of remedying the situation, she was retaliated against.   These complaints were related to Defendant Authority's General Counsel as well, all to no avail.

**67.**    In further retaliation for her complaints, Plaintiff was excluded from Top Cabinet Members' Meetings she used to attend.  Moreover, she was stripped of her office space in the Executive Offices Area, and relegated to a small desk space, outside Defendant Apple's Office.

**68.**    In addition, and over time, Defendants failed to assign Plaintiff any meaningful assignments.  Plaintiff's ensuing demotions, caused and continues to cause Plaintiff great embarrassment and humiliation amongst her Peers, and various Community and Political Leaders that frequented Defendant Authority, especially its Executive Offices.

**69.**    Due to her complaints of a sexist and hostile work environment, amongst others; Plaintiff was further isolated, stripped of her usual responsibilities, and not given the opportunity to advance within Defendant New York City Housing Authority.

**70.**    For instance, during the last Mayoral Election Campaign, in the Summer/Fall 2005, Plaintiff used her personal vacation time to assist the incumbent's Campaign in the Bronx County.  Due to her outstanding work in said Mayoral Campaign, Defendant Hernandez promised Plaintiff a substantial salary increase, as well as promotional advancement. To date, neither has materialized. Although Plaintiff applied for a vacant higher position within Defendant Authority, Defendant Hernandez blocked her from attaining said position. This position would have increased Plaintiff's annual salary by 15%, with commensurate increase in benefits.

**71.**    Although Plaintiff continues to protest Defendants' discriminatory and retaliatory conduct to the Authority's General Counsel, Mr. Ricardo Elias Morales; she is still subjected to a Hostile Work Environment.

**72.**    Furthermore, Defendant Apple continues to threaten Plaintiff with termination, for engaging in protected activity.

**73.**    Defendants' actions were in violation of the New York State Human Rights Law, Executive Law § 290 et. Seq..

**AS AND FOR A THIRD CAUSE OF ACTION: (Hostile Work Environment In Violation Of The New York City Human Rights Law Based On Sex, Age, And Retaliation By All Defendants Jointly And Severally)**

**74.**    Plaintiff repeats and re-avers each and every allegation contained in paragraphs1 through 73 of this amended complaint with the same force and effect as if fully set forth herein.

**75.**    Plaintiff is a 62 year old Female, who engaged in Protected Activity, and as such, Ms. Ambert is a member of a class of persons covered by and protected by the New York City Human Rights Law, Administrative Code § 8-101, et. seq.

**76.**    During her tenure with Defendants, Plaintiff's work performance, was and continues to be exemplary.

**77.**    In March 1998, Plaintiff was assigned by the New York City Mayor's Office (hereinafter "City Hall"), to serve as Assistant to Defendant New York City Housing Authority's Chairperson.  At the time, Mr. Ruben Franco was the Chairman of Defendant New York City Housing Authority.

**78.**    While at City Hall, Plaintiff served as Deputy Chief Of Staff, Of the Department of Education and Human Services.

**79.**    After her initial assignment to Defendant Authority, Plaintiff was directly supervised by Chairman Franco, until his departure in 1999.  Amongst her various duties,

Plaintiff served as the Chair's Liaison and the Mayor's Surrogate within the Latino Community.

**80.**     Moreover, before his departure, Chairman Franco assigned Plaintiff the Project of evaluating all of Defendant New York City Housing Authority's Senior Citizen Centers. This was a necessary step, in anticipation of the merger of the New York City Housing Authority's Senior Citizen Center and the New York City Department For The Aging (hereinafter "DFTA").

**81.**     In 1999, Mr. John Martinez, replaced Mr. Franco as Chair of the New York City Housing.  Soon after his appointment, Mr. Martinez assigned Plaintiff the responsibility of designing the Self-Empowerment Initiative Project, (hereinafter "Initiative Project").

**82.**     This empowerment project was the brain child of Plaintiff.  The Initiative Project's goal was to explore more meaningful ways of communication between Defendant Authority and its Residents.  Moreover, it devised better ways to get New York City Housing Authority's Residents more involved with Defendant Authority's selection process for its occupants.

**83.**     Plaintiff's efforts in developing and instituting the Initiative Project won Defendant Authority much acclaim from various Resident Organizations, Political and Community Leaders.  It also became a model for other Regional and National Housing Authorities, and culminated in getting HUD's "Best Practice Award".

**84.**     Plaintiff's work ethics, talent, and dedication to Defendant Authority, caused Chairman Martinez to elevate her and make her a member of New York City Housing

Authority's upper management "echelon".  Throughout his tenure, from 1999-2002, Mr. Martinez continued to directly supervise Plaintiff, and assign her meaningful projects.

85.    In March 2002, Defendant Tino Hernandez became the Chairman of Defendant Authority, replacing Mr. Martinez. Initially, Plaintiff continued to report directly to Defendant Hernandez.

86.    At one point, Plaintiff was demoted and was directed to report to the Authority's General Manager, namely Defendant Douglas Apple. Before this demotion, both Plaintiff and Defendant Apple reported to Defendant Hernandez directly.  Plaintiff believes that this demotion was due to Defendant Hernandez's preference to be surrounded by younger female employees, who tolerated his sexual advances and inappropriate touching.

87.    In late 2005 and early 2006, Defendant Hernandez began to assign Plaintiff tasks that were personal in nature, without any benefit or relation to the Business of Defendant Authority. Although she complained, her grievances were ignored by Defendant Authority's High Level Managers.

88.    After Defendant Hernandez was appointed as the new Chair of Defendant Authority, Plaintiff witnessed and became aware of inappropriate conduct by High Level Male Executives which she viewed as contributory to a Hostile Work Environment against Women in general, and Older Women in particular. These Executives included Defendants Hernandez and Apple.

89.    Examples of the inappropriate conduct Plaintiff witnessed and/or became aware of included but are not limited to, sexist and ageist remarks, as well as inappropriate touching.  Although she complained about same, instead of remedying the situation, she

was retaliated against.  These complaints were related to Defendant Authority's General Counsel as well, all to no avail.

**90.**     In further retaliation for her complaints, Plaintiff was excluded from Top Cabinet Members' Meetings she used to attend.  Moreover, she was stripped of her office space in the Executive Offices Area, and relegated to a small desk space, outside Defendant Apple's Office.

**91.**     In addition, and over time, Defendants failed to assign Plaintiff any meaningful assignments.  Plaintiff's ensuing demotion caused and continues to cause Plaintiff great embarrassment and humiliation amongst her Peers, and various Community and Political Leaders that frequented Defendant Authority, especially its Executive Offices.

**92.**     Due to her complaints of a sexist and hostile work environment, amongst others; Plaintiff was further isolated, stripped of her usual responsibilities, and not given the opportunity to advance within Defendant New York City Housing Authority.

**93.**     For instance, during the last Mayoral Election Campaign, in the Summer/Fall 2005, Plaintiff used her personal vacation time to assist the incumbent's Campaign in the Bronx County.  Due to her outstanding work in said Mayoral Campaign, Defendant Hernandez promised Plaintiff a substantial salary increase, as well as promotional advancement. To date, neither has materialized. Although Plaintiff applied for a vacant higher position within Defendant Authority, Defendant Hernandez blocked her from attaining said position. This position would have increased Plaintiff's annual salary by 15%, with commensurate increase in benefits.

**94.**     Although Plaintiff continues to protest Defendants' discriminatory and retaliatory conduct to the Authority's General Counsel, Mr. Ricardo Elias Morales; she is still subjected to a Hostile Work Environment.

**95.**     Furthermore, Defendant Apple continues to threaten Plaintiff with termination, for engaging in protected activity.

**96.**     Defendants' actions were in violation of the New York City Human Rights Law, Administrative Code § 8- 101, et. seq.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, CARMEN AMBERT, respectfully demands judgment and prays that this Court order:

(a)     A declaratory judgment that Defendants The New York City Housing Authority, Defendant Hernandez, Individually, and in his Official Capacity as Chair of Defendant New York City Housing Authority, and Defendant Apple, Individually, and in his Official Capacity as General Manager of Defendant New York City Housing Authority, through their agents, servants, or employees, violated Plaintiff's 1st and 14th Amendment rights as protected under the United States Constitution and 42 U.S.C. Section 1983; and that the same Defendants discriminated against Plaintiff in violation of The Human Rights § 290 <u>et. seq.</u> and The Administrative Code § 8-101 <u>et. seq.</u>

(b)     Requiring Defendants Authority, Hernandez and Apple, in their Official capacities, to pay Plaintiff compensatory damages for pain, suffering and damage to her reputation;

(c)    Requiring Defendants Authority, Hernandez and Apple, in their Official capacities, to pay to Plaintiff all reimbursable expenses;

(d)    Requiring Defendants Authority, Hernandez and Apple, in their Official capacities, under 42 U.S.C. § 1988, and/or the "Code", to pay Plaintiff all reasonable attorney's fees and costs of this action; and

(e)    Requiring Defendants Hernandez and Apple, in their Individual capacities, to jointly or severally, personally pay Plaintiff compensatory damages, punitive damages, attorney's fees and expenses, for violating her Constitutional and Civil Rights; and for

(g)    such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action.


Dated:
        Bronx, New York
        August 29, 2008

                                        Respectfully submitted,
                                        Law Offices of Lee Nuwesra

                                        */s/ Lee Nuwesra*
                                        Lee Nuwesra (LN 5851)
                                        Attorney for Plaintiff
                                        1623 Unionport Road, Suite 101
                                        Bronx, New York 10462
                                        (718) 942-4294